Slip Op. 07-96

## UNITED STATES COURT OF INTERNATIONAL TRADE

_____
|                                    :
LOUIS DREYFUS CITRUS INC.,           :
|                                    :
Plaintiff,                           :
|                                    :
v.                                   :     Before:      WALLACH, Judge
|                                    :     Court No.:   06-00122
UNITED STATES,                       :
|                                    :     **PUBLIC VERSION**
Defendant,                           :
and                                  :
|                                    :
FLORIDA CITRUS MUTUAL et al.,        :
|                                    :
Defendant-Intervenors.               :
_____ :

[Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record is DENIED and the Agency's Determination is AFFIRMED.]

Dated: June 19, 2007

Dewey Ballantine LLP, (Kevin M. Dempsey, David A. Bentley and Christophe F. Guibert de Bruet) for Plaintiff Louis Dreyfus Citrus Inc.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael J. Dierberg); and Mildred E. Steward, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, of Counsel, for Defendant United States.

Barnes, Richardson & Colburn, (Matthew T. McGrath, Stephen W. Brophy and James B. Doran) for Defendant-Intervenors Florida Citrus Mutual, A. Duda & Sons, Inc. (d/b/a Citrus Belle), Citrus World, Inc., and Southern Gardens Citrus Processing Corporation (d/b/a Southern Gardens).

## OPINION

**Wallach, Judge:**

### I
### Introduction

This case comes before the court on a Motion for Judgment Upon the Agency Record pursuant to USCIT Rule 56.2 brought by Louis Dreyfus Citrus Inc. ("Plaintiff" or "Louis Dreyfus"). Plaintiff claims it has suffered injury in fact from an order imposing antidumping duties ("AD") on frozen concentrated orange juice for further manufacture ("FCOJM") produced and exported by Plaintiff. Complaint ¶ 7; Antidumping Duty Order: Certain Orange Juice from Brazil, 71 Fed. Reg. 12,183 (March 9, 2006) ("AD Order"). Plaintiff challenges, inter alia, (1) the authority of the United States Department of Commerce ("Commerce" or "the Department") to initiate an investigation prior to the revocation of an order covering identical merchandise, (2) the producer-specific scope of the investigation, and (3) aspects of Commerce's Final Determination in Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances: Certain Orange Juice from Brazil, 71 Fed. Reg. 2,183 (January 13, 2006) ("Final Determination"), as amended by 71 Fed. Reg. 8,841 (February 21, 2006) ("Amended Final Determination"). Memorandum of Law in Support of Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record ("Plaintiff's Motion") at 2-3; Notice of Initiation of Antidumping Duty Investigation: Certain Orange Juice From Brazil, 70 Fed. Reg. 7,233 (February 11, 2005) ("Initiation of OJ AD Inv.").

For the reasons set forth herein, Plaintiff's Motion is DENIED.

## II
## Background

Plaintiff is an importer of frozen concentrated orange juice ("FCOJ")[1] and the parent

company of Coinbra-Frutesp, S.A. ("Coinbra-Frutesp"), a Brazilian producer of FCOJ.

Complaint ¶ 10.  On March 18, 2004, the United States Customs and Border Protection ("CBP"

or "Customs") issued a Notice of Action concerning an entry made by Coinbra-Frutesp on

November 17, 2003 in which it determined that exports of orange juice manufactured by

Coinbra-Frutesp were subject to the "all others" rate under a 1987 order on frozen concentrated

orange juice from Brazil. Letter from Christopher Dunn, Willkie Farr & Gallagher LLP to

Donald L. Evans, Sec'y of Commerce, U.S. Dep't of Commerce (August 4, 2004) ("LDCI CCR

Request") at 4-5, Confidential Record ("C.R.") at 5-6 (request for changed circumstances

review).  Customs also required that deposits be made on entries until Commerce confirmed

Coinbra-Frutesp's exclusion from the order in a changed circumstances review. Id. at 5, C.R. at

6; see also Antidumping Duty Order; Frozen Concentrated Orange Juice From Brazil, 52 Fed.

Reg. 16,426 (May 5, 1987) ("1987 FCOJ AD Order").

In August 2004, Louis Dreyfus requested a changed circumstances review wherein

Plaintiff stated that "Louis Dreyfus, through its virtually wholly-owned subsidiaries, is the

successor in interest to both Frutesp and Frutropic," both companies that had previously been

revoked from the 1987 FCOJ AD Order. LDCI CCR Request 5-6, C.R. at 6-7.  The successor-in-

interest relationship between Plaintiff and Coinbra-Frutesp was outlined by Plaintiff as follows.

---

[1] FCOJ and FCOJM are identical merchandise. See, e.g., Frozen Concentrated Orange Juice from Brazil, USITC Pub. 3760, Inv. Nos. 731-TA-326, I-11 (March 2005) ("Second FCOJ Sunset Review").

In 1988, Frutropic S.A. ("Frutropic") was purchased by Comércio e Indústrias Brasileiras Coinbra S.A. ("Coinbra"), a wholly-owned subsidiary of Louis Dreyfus. Id. at 3, C.R. at 4.  In October of 1992, Frutropic ceased to exist as a legal entity when it was formally dissolved. Letter from Christopher Dunn, Willkie Farr & Gallagher LLP to Carlos Gutierrez, Sec'y of Commerce, U.S. Dep't of Commerce (March 25, 2005) ("LDCI Additional Info. Letter") at 1, C.R. at 42.  On April 7, 1993, Frutropic notified Commerce that the company had been incorporated into Coinbra and that its named had changed to Coinbra or Frutropic/COINBRA. LDCI CCR Request at 3-4, C.R. 4-5.  Frutropic was at the time of purchase subject to the 1987 FCOJ AD Order from which it was revoked in 1994 under the name Frutropic/COINBRA. Id; see also Frozen Concentrated Orange Juice From Brazil; Final Results of Antidumping Duty Administrative Review and Revocation of Order in Part, 59 Fed. Reg. 53,137 (October 21, 1994) ("1994 FCOJ Final Results").  Coopercitrus Industrial Frutesp, S.A. ("Frutesp") was purchased by Plaintiff in 1993 after which "the assets, management and employees of Frutesp were transferred to the control of Louis Dreyfus and subsumed by it." LDCI CCR Request at 6, C.R. at 7.  The 1987 AD order for Frutesp had already been revoked in 1991. Id. at 2, C.R. at 3; Frozen Concentrated Orange Juice From Brazil; Final Results and Termination in Part of Antidumping Duty Administrative Review; Revocation in Part of the Antidumping Duty Order, 56 Fed. Reg. 52,510 (October 21, 1991) ("1991 FCOJ Final Results").  In 1994 the name of the merged company was changed to Coinbra-Frutesp. LDCI CCR Request at 6, C.R. at 7.  As a result of the outlined transactions, by 1994, Louis Dreyfus had acquired all assets of both Frutesp and Frutropic, and since the revocation of the antidumping duty order on Frutropic/COINBRA, has exported FCOJ to the United States exclusively under the name Coinbra-Frutesp. Id. at 4, C.R. at 5.

4

Prior to the commencement of Commerce's investigation into Certain Orange Juice from Brazil, the 1987 order on FCOJ underwent a sunset review. Initiation of Five-Year ("Sunset") Reviews, 69 Fed. Reg. 17,129 (Dep't of Commerce April 1, 2004); Frozen Concentrated Orange Juice From Brazil, 69 Fed. Reg. 17,230 (U.S. Int'l Trade Comm'n April 1, 2004) ("Initiation of FCOJ Sunset Review").  In November 2004 interested domestic parties submitted a letter to Commerce withdrawing any further interest in the 1987 order due to "its lack of any remaining remedial effect." Letter from Matthew T. McGrath et al., Barnes, Richardson & Colburn to Donald L. Evans, Sec'y of Commerce, U.S. Dep't of Commerce (December 27, 2004) ("Petition") at 3, C.R. at 13.  The interested domestic parties considered the 1987 order to have "small injury-mitigating effect" because only exporters Citrovita Agro Industrial, Ltda ("Citrovita") and Branco Peres Citrus were still known to be covered by the order. Id. at 4, C.R. at 14.  In addition, Citrovita was allegedly evading the order through tolling arrangements with a party excluded from the order, rendering the order largely ineffective. Letter from Matthew T. McGrath et al., Barnes, Richardson & Colburn to Donald L. Evans, Sec'y of Commerce, U.S. Dep't of Commerce (January 6, 2005) ("Petitioners' Response to Request for Add'l Info. in Support of Petition") at 14, C.R. at 20.  At the time of the sunset review most major producers and/or exporters of FCOJM had either been revoked or excluded from the order and as a consequence were outside the purview of the order. Petition at 3, C.R. at 13.  Moreover, the 1987 order did not cover pasteurized single-strength orange juice not-from-concentrate ("NFC"), which was a new product that had only been imported into the U.S. market subsequent to the issuance of the 1987 order due to new and more cost-efficient means of transporting the merchandise. Id; see also Certain Orange Juice from Brazil, USITC Pub. 3838, Inv. Nos. 731-

TA-1089 (March 2006) ("Final ITC Injury Determination") at IV-1.  On April 13, 2005,

Commerce revoked the 1987 order in its entirety. Revocation of Antidumping Duty Order:

Frozen Concentrated Orange Juice from Brazil, 70 Fed. Reg. 19,416 (April 13, 2005) ("FCOJ

Revocation").

On December 27, 2004, Florida Citrus Mutual, A. Duda & Sons, Inc. (d/b/a Citrus Belle),

Citrus World, Inc., and Southern Garden Citrus Processing Corporation (d/b/a Southern Gardens)

(collectively "Defendant-Intervenors"), domestic producers of orange juice, filed an antidumping

duty petition with Commerce alleging that imports of FCOJM and NFC from Brazil were being

sold in the United States at less than fair value ("LTFV"), materially injuring the domestic

industry. Defendant's Response to Plaintiff's Motion for Judgment Upon the Agency Record

("Defendant's Motion") at 3.  Petitioners requested that reconstituted orange juice, frozen orange

juice for retail ("FCOJR") and FCOJM produced by companies still subject to the old order be

excluded from the scope of the investigation. Petition at 42-43, C.R. at 15-16.  As a result of the

petition, Commerce, on February 11, 2005, initiated a LTFV investigation on Certain Orange

Juice from Brazil. Initiation of OJ AD Inv., 70 Fed. Reg. at 7,234.  Commerce crafted the scope

of the investigation specifically to not overlap with the 1987 FCOJ AD Order and therefore

included all orange juice not-from-concentrate, a class of merchandise not previously subject to

an order and FCOJM produced and/or exported only by Cargill Citrus Limitada, Citrosuco

Paulista S.A., Frutropic S.A., Montecitrus Industria e Comercio Limitada, and Sucocitrico

Cutrale S.A. (Cutrale), all of whom had been excluded or revoked from the old order. Id. at

7,234.  Commerce stated that it had also commenced a changed circumstances review to

determine whether Frutesp and Frutropic, trading under the name of Coinbra-Frutesp, would be

subject to the investigation. Id.  In its initiation notice Commerce stated that "should the Department find Louis Dreyfus or COINBRA-Frutesp to be the successor-in-interest to [Frutesp and Fruitropic], the successor company will be included as part of this proceeding." Id.

On March 18, 2005, Louis Dreyfus withdrew its request for a changed circumstances review and explained in a letter to Commerce on April 4, 2005, that for purposes of the new investigation Coinbra-Frutesp could not be considered the successor-in-interest to either Frutropic or Frutesp. Letter from Christopher Dunn, Willkie Farr & Gallagher LLP to Carlos Gutierrez, Sec'y of Commerce, U.S. Dep't of Commerce (March 18, 2005) ("LDCI Withdrawal of CCR Resquest") at 1-2, Plaintiff's Appendix at Tab J; Letter from Christopher Dunn, Willkie Farr & Gallagher LLP to Carlos Gutierrez, Sec'y of Commerce, U.S. Dep't of Commerce (April 4, 2005) ("Scope Comments Letter") 9-10, C.R. at 59-60.  Louis Dreyfus claimed that Coinbra-Frutesp's relationship to Frutropic and Frutesp did not meet Commerce's articulated standards by which it evaluates whether an entity is a successor-in-interest to an exporter and therefore could not lawfully be included within the scope of the investigation. Scope Comments Letter at 9-10, C.R. at 59-60.

On April 13, 2005, Commerce issued a notice of rescission of the changed circumstances review. Notice of Rescission of Changed Circumstances Antidumping Duty Administrative Review: Frozen Concentrated Orange Juice from Brazil, 70 Fed. Reg. 19,417 (April 13, 2005) ("Notice of Rescission").  Despite the rescission, Commerce's proceeded with its successor-interest determination as pertaining to the new investigation. See, e.g., Final Determination, 71 Fed. Reg. at 2,184.  Commerce issued a final determination on January 13, 2006, in which it deemed Coinbra-Frutesp the successor-in-interest to Frutropic and, consequently, that its

production and export of FCOJM fell within the scope of Commerce's antidumping duty

investigation and within the purview of the resulting AD order on Certain Orange Juice from

Brazil. Id. at 2,183; AD Order, 71 Fed. Reg. 12,183.  On March 9, 2006, Commerce published

the new antidumping duty order on Certain Orange Juice from Brazil. AD Order, 71 Fed. Reg.

12,183.

      Plaintiff timely commenced this action under 19 U.S.C. § 1516a(a)(2)(A)(i)(II).

Complaint ¶ 5.  The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  Oral argument was

held on April 18, 2007.

### III
### Standard of Review

      It is incumbent upon this court to sustain "any determination, finding, or conclusion" by

Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in

accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); see also Corus Staal BV v. United States,

395 F.3d 1343, 1346 (Fed. Cir. 2005).  Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v.

NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938).  The sufficiency of the evidence

is determined by "considering the record as a whole, including evidence that supports as well as

evidence that 'fairly detracts from the substantiality of the evidence.'" Huaiyin Foreign Trade

Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (citing Atl. Sugar, Ltd. v. United

States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

      In deciding whether the agency's statutory interpretation and application was made in

accordance with law the court is guided by the two-step analytical framework set out in Chevron

U.S.A. Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 842-843, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). Absent the "unambiguously expressed intent of Congress" the court will determine whether the agency's interpretation of the antidumping statute is a "permissible construction of the statute." Chevron, 467 U.S. at 843. The court will accord deference to the agency's determination and thus "not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology," so long as such procedures are a "reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions . . . ." Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404-05, 636 F. Supp. 961 (1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987).

**IV**
**Discussion**
**A**
**Commerce Lawfully Defined the Scope of the Investigation and Order on a Producer-Specific Basis**

When Commerce initiated the antidumping duty investigation on Certain Orange Juice from Brazil it crafted the scope of the investigation to include only "orange juice for transport and/or further manufacturing" produced in two different forms as either "(1) [f]rozen orange juice in a highly concentrated form, sometimes referred to as frozen concentrated orange juice for further manufacturing (FCOJM); and (2) pasteurized single-strength orange juice which has not been concentrated, referred to as Not-From-Concentrate (NFC)." Initiation of OJ AD Inv., 70 Fed. Reg. at 7,233-34. Due to the 1987 AD order on FCOJ from Brazil still in effect, Commerce specified the scope of the new investigation to cover "only FCOJM produced and/or exported by those companies who were excluded or revoked from the existing antidumping order on FCOJ

from Brazil as of December 27, 2004." Id. at 7,234.  In its initiation notice Commerce identified

the FCOJM producers and exporters subject to the investigation as Cargill Citrus Limitada,

Citrosuco Paulista S.A., Frutropic S.A., Montecitrus Industria e Comercio Limitada, and

Sucocitrico Cutrale S.A. (Cutrale) and specified that Louis Dreyfus and Coinbra-Frutesp would

be subject to the investigation if either were deemed to be the successor-in-interest to Frutesp and

Frutropic, because both companies had been revoked from the 1987 FCOJ AD Order. Id.; see

also 1991 FCOJ Final Results, 56 Fed. Reg. 52,510; 1994 FCOJ Final Results, 59 Fed. Reg.

53,137.

Plaintiff argues that the scope of Commerce's investigation was crafted contrary to statute

because it was producer-specific and yielded a discriminatory result. Plaintiff's Motion at 14-15

(citing 19 U.S.C. § 1673 (2000)).  Plaintiff contends that discrimination occurred when

Commerce subjected only revoked or excluded producers and exporters to AD duty liability

while exempting companies that were subject to the 1987 order prior to its revocation, but now

incur no AD duty liability. Id.; FCOJ Revocation, 70 Fed. Reg. 19,416.  While the International

Trade Commission ("ITC") undertook a full review of the 1987 order and in March 2005 issued

a negative injury determination, the domestic industry had already informed Commerce in

November 2004 that it no longer had any interest in the old order. Plaintiff's Motion at 14;

Petition at 3, C.R. at 13.  In this regard Plaintiff argues that Commerce should have halted the

investigation because it was aware of the impending revocation of the old order and that it could

result in a new order that would not encompass all Brazilian producers of FCOJM. Plaintiff's

Motion at 14-15.  Louis Dreyfus contends that the uneven application of antidumping duty laws

to producers and exporters of identical merchandise constitutes discrimination, which is contrary

to the AD statute. Id.  Because the antidumping statute requires that (1) duties be imposed on "all imports of the subject merchandise found to be dumped" and (2) exporters and producers not investigated must be subject to the "all others" rate, Plaintiff argues that by crafting a producer-specific scope Commerce acted contrary to its mandate. Id. at 15-16 (citing 19 U.S.C. §§ 1673, 1673d(c)).  Reading the statute otherwise, Plaintiff contends, would impermissibly construe the statute contrary to the United States' international obligations. Id. at 16-17 (citing Murray v. Schooner Charming Besty, 6 U.S. (2 Cranch) 64, 118,  L. Ed. 208 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains . . . .")).  In support of its argument Plaintiff cites Article 9.2 of the World Trade Organization Anti-dumping Agreement ("WTO AD Agreement") to which the United States is party. Id. at 16.  The agreement provides that the antidumping duties shall be collected "on a non-discriminatory basis on imports of such product from all sources." Id.; WTO AD Agreement, Art. 9.2.  Plaintiff notes that the U.S. Trade Representative has argued before World Trade Organization ("WTO") that non-discrimination for purposes of Article 9.2 is achieved when duties are properly imposed on a "product-specific [] basis, not a company-specific basis." Appellate Body Report, United States – Sunset Review of Anti-Dumping Duties on Corrosion-Resistant Carbon Steel Flat Products from Japan, ¶ 48, 150, WT/DS244/AB/R (December 15, 2003) (adopted January 9, 2004).  Plaintiff also cites to the Statement of Administrative Action to the Uruguay Round Agreements Act, which requires that LTFV investigations be conducted on a country-wide basis, and therefore, it says, implicitly not on a producer-specific basis. Plaintiff's Motion at 17-18 (citing the Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. Doc. 103-826 at 833, 875 (1994), reprinted

in, 1994 U.S.C.C.A.N. 4040).  The policy reasons underlying these rules, Plaintiff contends, are to avoid petitioners "cherry-pick[ing] which foreign producers/exporters would be subject to an antidumping investigation and duties" and thus convert the antidumping legislation into one that creates, rather than remedies, unfair trading conditions. Id. at 18.  Plaintiff concedes that while particular producers and exporters are regularly and legally excluded from AD duty liability under orders pursuant to an investigation, it is not proper to exclude companies that have not been investigated and found not to be dumping. Id. at 16-17 nn.7-8.  Plaintiff suggests a number of actions that Commerce could have taken in order to subsequently include remaining FCJOM producers within the scope of the new investigation following the revocation of the old order. Id. at 18-19.  Plaintiff further argues that it was incumbent on Commerce to take action to "prevent petitioners from 'gaming' the antidumping statute," and because it was aware that its antidumping investigation would produce "prejudicial and discriminatory results." Id. at 19-20 n.12 (citing Gilmore Steel Corp. v. United States, 7 CIT 219, 223, 585 F. Supp. 670 (1984)).

Defendant contends that nothing in the antidumping statute bars it from crafting the scope of an investigation on a company-specific basis where circumstances exist that warrant such a measure. Defendant's Motion at 12.  Commerce asserts that the decision to include specifically named producers within the scope of the investigation constitutes a reasonable exercise of its discretion. Id. at 9.

As an initial matter, it is incumbent on Commerce to engage in statutory interpretation where the "Congress has not directly addressed the precise question at issue." See Chevron, 467 U.S. at 842.  In such circumstances the role of the court is "not [to] conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction," but

instead to determine whether the agency's interpretation was "reasonable" in light of the record evidence. Id. at 843 n.11, 844.  Here, the antidumping statute does not prohibit Commerce from crafting a company-specific scope, nor is "discrimination" contrary to the statutory regime. 19 U.S.C. § 1673.  The Congressional intent underlying the antidumping statute is to "protect domestic manufacturing against foreign manufacturers who sell at less than fair market value." Koyo Seiko Co. v. United States, 20 F.3d 1156, 1159 (Fed. Cir. 1994).  Commerce's interpretation of the statute led to the inclusion of producers revoked or excluded from a previous order into a new investigation in which the scope was best delineated by producer.

Plaintiff's contention that Commerce is prohibited from initiating investigations with a company-specific scope covering revoked and excluded producers is not supported by binding law.  Commerce has periodically initiated investigations with company-specific scopes pertaining both to revoked and excluded producers. See, e.g., Issues and Decision Memorandum for the Antidumping Duty Investigation of Certain Orange Juice from Brazil from Stephen J. Claeys, Deputy Assistant Sec'y for Import Admin. to David M. Spooner, Assistant Sec'y for Import Admin., U.S. Dep't of Commerce (January 6, 2005) ("Decision Memo") at 6, C.R. at 70. For example, in Commerce's investigation of Woodwind Pads the petitioner requested an investigation into woodwind instrument keys manufactured and exported by a single manufacturer that had been revoked from a previous order on identical merchandise. Initiation of Antidumping Duty Investigation; Pads for Woodwind Instrument Keys from Italy Manufactured by Luciano Pisoni Accessori Strumenti Musicali A Fiato, 57 Fed. Reg. 54,220 (November 17, 1992) ("Woodwind Pads").  On the basis of the petition, Commerce launched a LTFV investigation limiting the scope of the investigation to "pads for woodwind instrument keys,

13

which are manufactured by Pisoni."[2] Id.; see also Decision Memo at 6, C.R. at 70.  Further, in another investigation into Nylon Impression Fabric Commerce initiated an investigation into two named producers that had previously been excluded from an existing order. Nylon Impression Fabric From Japan: Initiation of Antidumping Duty Investigation, 50 Fed. Reg. 28,111 (July 10, 1985) ("Nylon Impression Fabric").  Commerce defined the scope of that investigation to include only "nylon impression fabric from Japan, produced by or for the account of Asahi and Shirasaki." Id.  Similarly in an investigation into tapered roller bearings from Japan, Commerce defined the scope of the investigation to cover all tapered roller bearings and parts thereof manufactured exclusively by NTN, a manufacturer that had previously been revoked from a pre-existing order on identical merchandise. Final Determination of Sales at Less Than Fair Value; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, 52 Fed. Reg. 30,700 (August 17, 1987) ("TRBs from Japan").  The scope of the investigation was crafted specifically to prevent NTN from importing parts of the merchandise and assembling it in the United States thereby circumventing the order. Decision Memo at 6-7, C.R. at 70-71.[3]  Plaintiff

---

[2] The final determination covered two producers, but was still company-specific because only two manufacturers and exporters of woodwind pads from Italy were identified. See Final Determination; Antidumping Duty Investigation of Pads for Woodwind Instrument Keys From Italy Manufactured by Music Center s.n.c. di Luciano Pisoni and Lucien s.n.c. di Danilo Pisoni & C., 58 Fed. Reg. 42,295 (August 9, 1993).

[3] Plaintiff's contention that TRBs from Japan does not set precedent for Commerce's use of company-specific scopes is misplaced because the court's concern in NTN Bearing Corp. of Am. v. United States, 14 CIT 623, 747 F. Supp. 726 (1990) was that Commerce had crafted the scope to conditionally include NTN merchandise in the event the merchandise would no longer be subject to the preexisting order from which it had not yet been revoked. Id. In an earlier decision, the court noted that Commerce impermissibly departed from its own practice by including a category of merchandise in a new investigation which was already covered by an existing antidumping duty order through conditional inclusion, but the court did not hold that drafting a company-specific scope was contrary to law. NTN Bearing Corp. of Am. v. United

distinguishes these cases by arguing that the producers and exporters had received

"nondiscriminatory treatment" because the original order remained in place and therefore all

producers were subject to either the original order or the follow-up investigation and that "no

exporter was exempt from antidumping duties without having first been investigated and found

not to be dumping." Plaintiff's Motion at 17 n.8.  However, all producers or exporters of FCOJM

have been recently investigated either as part of the sunset reviews of the old order or as part of

the new investigation.  In fact, both Citrovita and Branco Peres Citrus, which Plaintiff cites to in

its brief as being exempted from AD liability while still dumping, were found in the final ITC

sunset determination to not cause material injury to the domestic industry, despite an earlier

affirmative injury determination. <u>Frozen Concentrated Orange Juice From Brazil; Final Results</u>

<u>of the Expedited Sunset Review of the Antidumping Order</u>, 69 Fed. Reg. 54,117 (Dep't of

Commerce September 7, 2004) ("<u>Final Results of Expedited FCOJ Sunset Review</u>"); <u>Second</u>

<u>FCOJ Sunset Review</u> at 3.  Therefore all producers and exporters were subject to AD duty

liability prior to the revocation of the 1987 order and when the new investigation was initiated.

<u>Second FCOJ Sunset Review</u>, at 3-5; <u>FCOJ Revocation</u>, 70 Fed. Reg. 19,416; <u>Initiation of OJ</u>

<u>AD Inv.</u>, 70 Fed. Reg. 7,233.  Furthermore, in keeping with the decision handed down in <u>NTN</u>

<u>Bearing</u>, 13 CIT 91, Commerce declined to craft a scope that conditionally included producers

and exporters still subject to the 1987 order and instead named all producers that at the time were

excluded or revoked from that order to be included in the new investigation. <u>Initiation of OJ AD</u>

<u>Inv.</u>, 70 Fed. Reg. 7,233.

_____

<u>States</u>, 13 CIT 91, 94, 705 F. Supp. 594 (1989), <u>remanded on other grounds</u>, 892 F.2d 1004 (Fed.
Cir. 1989).

Furthermore, Plaintiff argues that application of AD duties on a non-discriminatory basis is implicit in 19 U.S.C. § 1673, which requires that duties are assessed on "merchandise" and not on specific producers. Plaintiff's Reply to Defendant's and Defendant-Intervenors' Responses to Plaintiff's Motion for Judgment Upon the Agency Record ("Plaintiff's Reply") at 2 (citing 19 U.S.C. § 1673; Jia Farn Mfg. Co., Ltd. v. United States, 17 CIT 187, 192, 817 F. Supp. 969 (1993)). Clearly antidumping laws are aimed at merchandise and not at specific foreign producers, but this argument does not take into account the limited circumstances in which Commerce has reason to craft a narrower scope. In addition, Plaintiff cites to 19 U.S.C. § 1673d(c)(1)(B) as requiring that an "all others" rate be set for producers not investigated, again not recognizing that Commerce with respect to FCOJM was restrained in broadening the scope of the investigation to avoid an overlap with the existing order. Plaintiff's Reply at 2.

Plaintiff's contention that a reading of the statute that permits Commerce to draft a company-specific scope is contrary to the United States' international obligations is also without foundation. Whereas the Uruguay Round Agreements Act and Article 9.2 of the WTO AD Agreement may refer to antidumping investigations as traditionally conducted and applied on a country-wide basis, neither agreement, by implication or otherwise, prohibits Commerce from conducting investigations or issuing orders pertaining to specific producers or exporters. SAA, H.R. Doc. 103-826 at 833, 875; WTO AD Agreement, Art. 9.2. Here, Commerce acted reasonably by crafting a scope that prevented an overlap with an existing order, and contrary to Plaintiff's contentions, did not engage in "cherry-picking" whereby producers and exporters would be subject to the order. In fact, launching an investigation on the basis of a petition, as required by statute, despite an existing order and an on-going sunset review process, did not

16

create unfair trading conditions, whereas permitting foreign producers to chose which investigations and orders they would be subject to might very well do so.

Moreover, it was not incumbent on Commerce to refuse to initiate an investigation based on merchandise already subject to an order, to rescind the investigation due to the on-going sunset review of the old order, or to rescind the investigation when the 1987 order was revoked. Commerce therefore did not err in denying petitioners' request to include all Brazilian producers of FCJOM within the scope of the order after revocation of the original order. See Letter from Matthew McGrath, Barnes, Richardson & Colburn to Carlos Gutierrez, Sec'y of Commerce, U.S. Dep't of Commerce (March 31, 2005) ("Petitioners' Request for Clarification of Scope"), C.R. at 53, P.R. 103; Letter from Louis Apple, Dir. AD/CVD Operations, U.S. Dep't of Commerce to Matthew T. McGrath, Barnes, Richardson & Colburn (June 27, 2005) ("Commerce's Response to Request for Scope Clarification") at 1-2, Plaintiff's Non-Confidential Appendix, Tab K. Section 1673 provides that antidumping duties will be imposed if: (1) Commerce makes a determination that "a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value" and (2) the International Trade Commission determines that "an industry in the United States is materially injured, or is threatened with material injury . . . by reason of imports of that merchandise or by reason of sales (or the likelihood of sales) of that merchandise for importation." 19 U.S.C. § 1673(1)-(2).  Further, 19 U.S.C. § 1673a which governs procedures for the initiation of antidumping duty investigations is silent on the matter of initiating investigations with respect to excluded or revoked producers. 19 U.S.C. §1673a. Regulations pertaining to the termination of an AD investigation and sunset reviews also do not confer any obligations upon Commerce to terminate a review based on analogous circumstances

to those of this case. 19 C.F.R. § 351.207.  As a result, Plaintiff's contention that "antidumping duties be applied to all subject imports from a country subject to an investigation, unless a particular producer/exporter is investigated and found not to be dumping," is unsupported by the statutory scheme. Plaintiff's Motion at 15.  In addition, because Commerce is required to initiate an antidumping investigation within a limited time after a properly filed petition, it did not have the option of awaiting the outcome of the sunset review before launching and deciding the scope of the new investigation. 19 U.S.C. § 1673a(b)-(c)(1)(A).[4]  Instead, Commerce had to craft a scope that excluded producers and exporters already subject to an order in effect.[5]  Contrary to Plaintiff's contention, Commerce is not at liberty to "restart" an investigation.  Statutorily, Commerce may only terminate a continuing investigation in limited circumstances, such as where petitioners withdraw their petition or the ITC determines that imports of the subject merchandise are negligible. 19 U.S.C. §§ 1673c(a)(1)(A); 1673b(a)(1).  In addition, the court has held it appropriate to terminate an investigation "in order to correct a manifest error which taints the proceeding," Gilmore Steel, 7 CIT at 223, and if the "allegations essential to the fundamental

---

[4] Commerce initiated the new investigation on February 11, 2005 and the ITC's negative injury determination was published in the Federal Register on March 29, 2005. Initiation of OJ AD Inv., 70 Fed. Reg. 7,233; Frozen Concentrated Orange Juice from Brazil Determination, 70 Fed. Reg. 15,884 (ITC March 29, 2005) ("ITC FCOJ Notice").

[5] Petitioners filed a request for clarification of the scope investigation, seeking to include producers/exporters of FCOJM previously subject to the 1987 order after revocation of the order. Petitioners' Request for Clarification of Scope.  Commerce responded to this request that petitioners should file an amended petition to include producers previously subject to the old order. Commerce's Response to Request for Scope Clarification at 2. Commerce noted in its response to the scope clarification request that "it is the Department's practice to accord the petitioners' scope description great weight in an investigation because the petitioners can best determine from what imports they require relief." Id. at 2.  Petitioners did not file an amended petition.

sufficiency of a petition are false," <u>Tung Fong Indus. Co. v. United States</u>, 366 F. Supp. 2d 1308,

1316 (CIT 2005).

Here, Commerce properly crafted the scope to include all excluded and revoked Brazilian

exporters of FCOJM and all Brazilian exporters of NFC because at the time a valid order was

still in effect for FCOJ.  Because Commerce is not precluded from crafting company-specific

scopes where necessary, and because Commerce crafted the scope so as to avoid an overlap with

an existing order, it did not commit a "manifest error" within the parameters of <u>Gilmore Steel</u>.[6]

Further, this court under <u>Chevron</u> is required to give deference to Commerce's determination

where it is consistent with "the intent of the legislature or the guiding purpose of the statute."

<u>Ceramica Regiomontana</u>, 10 CIT at 405 (citing <u>Chevron</u>, 467 U.S. at 843-844).  In this instance,

Commerce's initiation of the investigation and its scope determination constituted a reasonable

means of effectuating the applicable statutes, supported by substantial evidence in the record and

in accordance with Commerce's "precedent, practice, and the law." <u>Id.</u>; Decision Memo at 8,

C.R. at 72.

**B**
**Commerce Lawfully Included Merchandise Produced and Exported by Coinbra-Frutesp**
**Within the Scope of the New Order**

Plaintiff argues that Commerce crafted a scope in which there was an impermissible

overlap between the old order and the new investigation and order, and that Coinbra-Frutesp was

---

[6] In Plaintiff's Reply it argues that <u>Gilmore</u> conferred Commerce with the authority to prevent a "discriminatory result" resulting from the exclusion of producers subject to the 1987 order, upon which it should have acted. Plaintiff's Reply at 2.  Plaintiff fails to show that Commerce committed a "manifest error" under <u>Gilmore</u> or that any other legal authority compels Commerce to terminate an investigation upon the subsequent revocation of an order which has the effect of leaving some producers or exporters free of AD duty liability.

19

subject to both.  Plaintiff's arguments are unavailing because: (a) Commerce may conduct investigations on producers that are revoked from an existing antidumping order, (b) Coinbra-Frutesp was revoked from the old order before the petition for the new investigation was filed, (c) Commerce has the authority to make a successor-in-interest determination at any time during the investigation, and (d) Commerce did not expand the scope of the final determination by including Coinbra-Frutesp in the new investigation.

### 1
### Commerce May Conduct Investigations on Producers Revoked from an Existing Antidumping Order

Plaintiff contends that Commerce may not initiate an antidumping investigation on merchandise already covered by an order and acted contrary to law in its initiation of the investigation of Certain Orange Juice from Brazil. Plaintiff's Motion at 21.  Plaintiff's primary cited authority is <u>NTN Bearing</u>, 13 CIT 91, 96, in which this court held that Commerce is prohibited "from initiating a new investigation which includes within its purview a class of merchandise that is already subject to an outstanding antidumping duty order."  The court, however, arrived at its conclusion based on the rationale that Commerce would engage in redundancy by launching multiple investigations of identical merchandise when such investigations could only permissibly result in a single order. <u>Id.</u> at 95.  In addition, the court noted that "[a]n affirmative antidumping duty determination should only be based on a class of merchandise which actually will be subject to a resulting antidumping duty order." <u>Id.</u>

Defendant argues that it permissibly crafted the scope of the investigation so as to avoid an overlap between the old order and the new investigation and that it has wide latitude in

defining the scope of an investigation and order. Defendant's Motion at 33.

In circumstances where the possibility of administering two proceedings arises, Commerce has developed a policy to craft the scope of the latter proceeding to ensure that there is no overlap. Decision Memo at 7, C.R. at 71 (citing Notice of Initiation of Antidumping Duty Investigations: Magnesium Metal From the People's Republic of China and the Russian Federation, 69 Fed. Reg. 15,293, 15,294 n.2 (March 25, 2004); Notice of Final Determination of Sales at Less Than Fair Value: Pure Magnesium in Granular Form From the People's Republic of China, 66 Fed. Reg. 49,345 (September 27, 2001)); see also Defendant-Intervenors' Response in Opposition to Rule 56.2 Motion for Judgment Upon the Agency Record ("Defendant-Intervenors' Motion") at 24. In fact, Commerce considers avoiding double assessment of duties a key element in crafting a scope. Id. (citing Color Television Receivers From Korea; Intention to Review and Preliminary Results of Changed Circumstances Administrative Review and Tentative Determination to Revoke Antidumping Duty Order, 52 Fed. Reg. 6,840 (March 5, 1987)). Here, Commerce acted consistently with prevailing law and with the holding in NTN Bearing by legitimately initiating an investigation with a company-specific scope that did not overlap with the existing order on the same merchandise, and by launching an investigation into producers and exporters revoked or excluded from the old order. Acting on a petition aimed at producers and exporters of FCOJM and NFC (an expanded class of merchandise) could only be achieved by excluding companies already subject to an order on similar merchandise. Indeed, as stated by the Government in its brief "the purpose of the company-specific scope in this case was to address dumping by revoked and excluded producers in a way that did not overlap with the 1987 order." Defendant's Motion at 33. Moreover, initiating investigations on a class of

21

merchandise already subject to a pre-existing order is not contrary to past precedent.  For example, in Woodwind Pads and Nylon Impression Fabric, Commerce conducted investigations of different producers on the same merchandise that had previously been investigated and been subject to an order. Id. at 12; see Woodwind Pads, 57 Fed. Reg. 54,220; Nylon Impression Fabric, 50 Fed. Reg. 28,111.

**2**
**FCOJ Produced and Exported by Coinbra-Frutesp was Not Subject to the Old Antidumping Order when the Petition for the New Investigation was Filed**

Plaintiff asserts that Customs' Notice of Action[7] filed in March 2004 subjected Coinbra-Frutesp to the old order and that Commerce as a result impermissibly included Plaintiff in the new investigation based on its successor-in-interest determination. Plaintiff's Motion at 22. Louis Dreyfus also contends that the rescission of its requested changed circumstances review, combined with the revocation of the 1987 order, automatically subjected Coinbra-Frutesp to the old order and that Commerce consequently lost its opportunity to determine Coinbra-Frutesp's dumping liability when that was revoked. Id. at 29-30.

In Customs' Notice of Action it stated that Coinbra-Frutesp were subject to payment of cash deposits at a rate of 1.96% in the absence of a changed circumstances review confirming Plaintiff's right to exclusion from antidumping duty deposits. LDCI CCR Request at 4-5, C.R. at

---

[7] Customs' Notice of Action is not part of the administrative record of this case but is periodically referred to in documents contained in the record and in the parties' briefs. See, e.g., LDCI CCR Request at 4-5, C.R. at 5-6.  Commerce rejected the inclusion of the notice in the administrative record pursuant to 19 C.F.R. § 351.104(a)(2)(ii)(A) because it contained new factual information and was untimely filed. Letter from Shawn Thompson, Program Manager, AD/CVD Operations, U.S. Dep't of Commerce to Christopher Dunn, Willkie Farr & Gallagher LLP (November 2, 2005) ("Rejection Letter"), C.R. at 90.

5-6.  In response, Louis Dreyfus filed a request for a changed circumstances review asking for affirmation of its revoked status under the old order as the successor-in-interest to both Frutesp and Frutropic. Id. at 5-6, C.R. at 6-7.  In March 2005, Louis Dreyfus withdrew its request for the changed circumstances review and asserted in a letter to Commerce that Coinbra-Frutesp is not the successor-in-interest to Frutropic and Frutesp and therefore should "remain excluded from this investigation." LDCI Withdrawal of CCR Request 1-2, Plaintiff's Appendix at Tab J; Scope Comments Letter at 10, C.R. at 60.

Louis Dreyfus has maintained that it was the successor-in-interest to Frutesp and Frutropic since the revocation of both companies from the 1897 AD order, in 1991 and 1994 respectively, and thus has not paid any duties under the old order. LDCI CCR Request at 3-4, C.R. at 4-5.  Customs' Notice of Action appropriately requested that Plaintiff submit a changed circumstances review request in order to affirm its exclusion from the 1987 order under the "all others" rate based on the fact that Plaintiff was trading under the name Coinbra-Frutesp, a company not in existence at the time of the original order, not subject to the original investigation, and never revoked from the order in its own capacity.  Plaintiff predictably submitted a request for a changed circumstances review in which it reiterated the position that it had taken for the duration of the period in which it owned and operated Frutesp and Frutropic, namely that Coinbra-Frutesp was the successor-in-interest to both and therefore the revocation from the order should apply to all entries of FCOJ by Coinbra-Frutesp. Id. at 5, C.R. at 6. Plaintiff's subsequent withdrawal of its request for review and its change in position would at minimum render it liable for its omission to pay duties under the old order dating back almost a decade.

Plaintiff argues that Custom's Notice of Action was "final and conclusive" agency action rendering Coinbra-Frutesp liable under the old order absent a request for a scope ruling or changed circumstances review. Plaintiff's Motion at 24-25 (citing Fujitsu Ten Corp. of Am. v. United States, 21 CIT 104, 107, 957 F. Supp. 245 (1997), aff'd sub nom. Sandvik Steel Co. v. United States, 164 F.3d 596 (Fed. Cir. 1998); Sandvik Steel Co. v. United States, 21 CIT 140, 142, 957 F. Supp. 276 (1997), aff'd 164 F.3d 596).   Plaintiff also contends that Customs' Notice of Action is part of the record despite Commerce's exclusion of the document from the administrative record because it was untimely filed. Plaintiff's Motion at 23 n.15; see Rejection Letter at 1-2, C.R. at 90-91.   Plaintiff's argument fails to recognize that Commerce makes scope decisions that are binding upon Customs, not vice versa.   Indeed, Customs' role in liquidating entries subject to antidumping orders is "merely ministerial" and "follows Commerce's instructions in assessing and collecting duties." Mitsubishi Elec. Am., Inc. v. United States, 44 F.3d 973, 977 (Fed. Cir. 1994).   In Mitsubishi Elec., the Federal Circuit stressed that the statute upon which Plaintiff also relies, "makes clear that Customs does not make any section 1514 antidumping decisions" and that "Customs cannot modify . . . [Commerce's] determinations, their underlying facts, or their enforcement." Id. (internal citations omitted).   Plaintiff's proposed reading of the statute would divest Commerce of its role of "issuing, interpreting and implementing anti-dumping orders." Defendant's Motion at 39.   The real effect of the statute's language is to prevent producers and exporters from retroactively challenging the scope of an order once the entries are liquidated by Customs and the exporter did not request a scope decision from Commerce at the time. See 19 U.S.C. § 1514(b).   Further, Plaintiff's reliance on Sandvik Steel and Fujitsu Ten does not lend support to the proposition that Customs' liquidation

is "final and conclusive;" in fact, nothing in these opinions suggest that Commerce is precluded from making a scope determination that is contrary to Customs' scope determination prior to the liquidation of entries.

Customs' Notice of Action did not become part of the record and therefore cannot be relied upon as forming the basis for Plaintiff's liability under the old order.  According to prevailing case law only "documents and materials directly or indirectly considered by agency decision-makers" become part of the administrative record. Thompson v. United States, 885 F.2d 551, 555 (9th Cir. 1989).  Plaintiff has not adequately demonstrated that Commerce considered Customs' Notice of Action in its investigation and therefore this court is similarly unable to base a decision on a document which is not contained in the record, and upon which the agency's determination did not rely.  This court held that "those documents at the agency which become sufficiently intertwined with the relevant inquiry are part of the record, no matter how or when they arrived at the agency." Acciai Speciali Terni S.p.A. v. United States, 24 CIT 1064, 1071, 118 F. Supp. 2d 1298 (2000) (internal citations omitted).  However, there Commerce used significant portions of the administrative records in two separate proceedings to arrive at its conclusion in both proceedings, therefore creating an overlap which necessitated that the court was able to consider both records on review of the agency's determination. Id. at 1072.  This is not the case here.

Furthermore, the notice of rescission of the changed circumstances review did not state that "CBP would continue to suspend liquidation of Coinbra-Frutesp's entries of FCOJ." Plaintiff's Motion at 28.  It stated that Customs would continue to suspend liquidation "as appropriate" of "FCOJ from Brazil," because at the time of the notice of rescission the 1987

order was still in effect. Notice of Rescission, 70 Fed. Reg. 19,417.  The fact that Commerce did

not issue a final determination in the changed circumstances review prior to rescission of the

review and the issue becoming moot after the revocation of the old order did not automatically

subject Coinbra-Frutesp to liability for duties under the "all others" rate of the old order.

As a result of the fact that Customs' Notice of Action does not establish legally binding

antidumping duty liability upon Coinbra-Frutesp under the old order and because the Notice of

Action never became part of the administrative record underlying Commerce's investigation that

led to the inclusion of Coinbra-Frutesp into the new investigation, Coinbra-Frutesp was not

subject to the old antidumping order on FCOJ from Brazil when the petition for the new

investigation was filed.

**3**
**Commerce May Conduct a Successor-in-Interest Investigation to Decide Whether an Entity**
**Falls Within the Scope of the Antidumping Investigation**

Louis Dreyfus contends that Commerce developed its successor-in-interest test to be able

to consider a company's change in circumstances after an antidumping order is in place, but that

Commerce acted contrary to law by making its successor-in-interest determination after the order

to which it applied was revoked. Plaintiff's Motion at 30-31 (citing Marine Harvest (Chile) S.A.

v. United States, 26 CIT 1295, 1310, 244 F. Supp. 2d 1364 (2002)).  Plaintiff stresses that

Commerce in the past has only made successor-in-interest determinations in the context of orders

still in effect. Id. at 31 (citing Jia Farn Mfg., 17 CIT at 190).

Defendant argues that the successor-in-interest determination was made in the context of

the new investigation, and that Commerce may "lawfully address successor-in-interest issues as

necessary to define and interpret the scope of an investigation and order." Defendant's Motion at

28. Defendant further notes that Plaintiff is not contesting the merits of the successor-in-interest

determination, but the time and context in which it was made. Id.

Commerce examined the successor-in-interest issue both in the context of the 1987 order

and in the new investigation. In its initiation notice Commerce stated that "the Department will

also examine the successor-in-interest issues for both Frutesp and Frutropic in the context of this

proceeding" and further noted that "should the Department find Louis Dreyfus or COINBRA-

Frutesp to be the successor-in-interest to these companies, the successor company will be

included as part of this proceeding." Initiation of OJ AD Inv., 70 Fed. Reg. at 7,234. Plaintiff's

petition for the changed circumstances review addresses the successor-in-interest issue in the

context of the old order advocating that Coinbra-Frutesp and/or Louis Dreyfus be considered the

successor-in-interest to Frutesp and Frutropic so as to remain revoked from AD liability under

the old order. LDCI CCR Request at 3-4, C.R. at 4-5. Given the subsequent change in Plaintiff's

position regarding its successor-in-interest relationship with Frutesp and Frutropic and

Commerce's rescission of the changed circumstances review it remained incumbent upon

Commerce to determine whether Plaintiff was the successor-in-interest for purposes of the new

investigation. This determination could have affected liability under the old order, but this issue

was moot due to the revocation of the 1987 order prior to the issuance of the final determination.

1987 FCOJ AD Order, 52 Fed. Reg. 16,426; Notice of Rescission, 70 Fed. Reg. 19,417; Final

Determination, 71 Fed. Reg. 2,183. In response to Plaintiff's contention that Commerce is

prohibited from performing a successor-in-interest determination under the Tariff Act in these

circumstances, Commerce in its Issues and Decisions Memorandum stated that "while the Act

27

does not expressly provide for this type of determination in an LTFV investigation, we find that

it does also not expressly prohibit it." Decision Memo at 16, C.R. at 77.  Coupled with Plaintiff's

withdrawal of its petition for a changed circumstances review, this is sufficient to warrant

Commerce's inclusion of the successor-in-interest issue in its final determination.  Moreover,

Commerce's scope determination merely affirmed Plaintiff's stated position and long-standing

practice of not paying duties under the old order, in turn subjecting Louis Dreyfus to the new

investigation and subsequent order.  Commerce has the discretion to define the scope of an

investigation and there is no law prohibiting it from applying its successor-in-interest test as a

mechanism to determine whether a certain producer should be included in the scope.[8]  Commerce

is entitled to deference in making its determination and acted consistently with its authority and

discretion in deciding that a successor-in-interest finding was an appropriate means of

determining the scope of the investigation and subsequent order. Chevron, 467 U.S. at 843.

**4**
**Commerce Did Not Expand the Scope of the Investigation in its Final Determination by
Including Coinbra-Frutesp Within the Scope**

According to Plaintiff, Commerce lacked the authority to include Coinbra-Frutesp within

the scope of the final determination because the ITC excluded merchandise produced and

exported by Plaintiff from the scope of its preliminary injury determination. Plaintiff's Motion at

---

[8] Contrary to Plaintiff's assertions, Valkia Ltd. v. United States, Slip Op. 04-71, 2004 CIT
LEXIS 66 (CIT June 18, 2004) does not stand for the proposition that the only exception to when
Commerce may utilize the successor-in-interest test outside an administrative review or changed
circumstances review is "where there is a change of circumstances during a LTFV investigation
that would justify use of the successor-in-interest test." Plaintiff's Motion at 31 n.21 (emphasis in
original).  In fact, the case is illustrative of the fact that Commerce has discretion to apply the test
outside of its conventional use when the need arises.

33.  Plaintiff contends that while Commerce may clarify the scope of an investigation, it is

statutorily prohibited from expanding the scope. Id. (citing Royal Bus. Mach., Inc. v. United

States, 1 CIT 80, 87, 507 F. Supp. 1007 (1980)).  The principal assertion made by Plaintiff is that

Commerce is prohibited from expanding the scope "mid-stream" because (1) Commerce's final

determination may only apply to merchandise that served as the basis for the ITC's affirmative

preliminary injury determination and, (2) the scope at each stage of the investigation must remain

unchanged. Id. at 34.

Defendant argues that because the scope from the outset of the investigation

contemplated the inclusion of Coinbra-Frutesp, Commerce's subsequent inclusion of Plaintiff

constituted a mere clarification of the scope and not an expansion. Defendant's Motion at 31-32.

Defendant furthermore distinguishes Plaintiff's support for its proposition as relying exclusively

on cases in which there was a request to modify, as opposed to expand, the scope to include

merchandise not covered at the outset of the investigation. Id.

It is well established that Commerce must show caution in expanding the scope of an

investigation to cover merchandise that was either not included or specifically excluded at the

outset of an investigation. See, e.g., Smith Corona Corp. v. United States, 16 CIT 562, 565, 796

F. Supp. 1532 (1992).  Plaintiff also provides persuasive authority that supports the notion that

Commerce may only include in its final determination merchandise that served as a basis for

ITC's preliminary injury determination. Plaintiff's Motion at 34 (citing 19 U.S.C. §§ 1677(25),

1673b(a)(1)).  However, case law suggests that Commerce has broad authority to modify the

scope of an investigation so long as it is supported by substantial evidence and does not have a

prejudicial effect. Torrington Co. v. United States, 14 CIT 507, 511 n.3, 745 F. Supp. 718 (1990),

aff'd, 938 F.2d 1276 (Fed. Cir. 1991).  Here, Frutropic, Frutesp and Coinbra-Frutesp were specifically mentioned in the initiation notice as conditionally subject to the investigation and were clearly producers and exporters of the "class or kind of merchandise" under investigation. Initiation of OJ AD Inv., 70 Fed. Reg. at 7,234; 19 U.S.C. § 1677.  In Commerce's Issues and Decision Memorandum, the Department noted that "[i]n both our notice of initiation and the preliminary determination, we stated that we intended to make a successor-in-interest finding with respect to Coinbra-Frutesp in order to determine whether its exports of FCOJM are subject to this proceeding." Decision Memo at 12, C.R. at 73.  Commerce did not suspend liquidation of entries of Coinbra-Frutesp's FCOJM simply because it is prohibited from imposing provisional measures on imports upon which the ITC did not make a preliminary injury determination. Id. at 19, C.R. at 80 (citing 19 U.S.C. § 1673).  Plaintiff's contention that the merchandise was excluded ab initio is therefore without merit.  Additionally, Commerce was not undertaking a scope determination nor does the inclusion of a successor-in-interest to a party already within the scope of the investigation act to expand it.  Indeed, had Coinbra-Frutesp been excluded from the scope in the final determination, this may have served to alter the scope.  Plaintiff's conditional inclusion into the investigation did not cause prejudice, and although Plaintiff was not specifically mentioned in the ITC's preliminary determination, Coinbra-Frutesp was mentioned in its final determination. Final ITC Injury Determination at IV-1. The inclusion of Coinbra-Frutesp was therefore reflected in both agencies' actions throughout the investigation, and the scope of the investigation was not unlawfully expanded by the inclusion of Plaintiff.

**C**

**Coinbra-Frutesp Could Lawfully be Subject to the New Investigation Because it was Revoked from the Old Order**

Plaintiff argues that Commerce's investigation was unlawfully commenced upon revoked producers and exporters because producers that are revoked from an order remain conditionally subject to the order from which they have been revoked. Plaintiff's Motion at 36-37.  Plaintiff contends that the statutory scheme which imposes reinstatement of AD liability on revoked producers that resume dumping subjects the revoked producers to conditional liability for the life-span of the order. Id. (citing 19 U.S.C. § 1675(d); 19 C.F.R. § 351.222(b)(2)(i)(B)).

Here, Commerce's new investigation covered an expanded class of goods, namely FCOJM and NFC.  The statute to which Plaintiff refers merely authorizes the revocation of a specific producer from an AD order but does not preclude Commerce from initiating a new investigation where dumping is alleged in an expanded class of goods.  Plaintiff contends that "incorporating into a new investigation merchandise that is already subject to an antidumping duty order, albeit revoked, is not a permissible remedial measure to determine whether there has been a resumption of sales at less than fair value." Plaintiff's Motion at 37 (citing NTN Bearing, 13 CIT at 94).  In opposition to Plaintiff's analysis, Defendant-Intervenors note that Commerce's authority to reinstate revoked producers under Asahi Chem. Indus. Co. v. United States, 13 CIT 987, 990, 727 F. Supp. 625 (1989) remains limited because the court found that "the revocation determination of Commerce quashes the effect of an antidumping order, notwithstanding the language in the regulation implying that the revoked order may be reinstated." Defendant-Intervenors' Motion at 37.  Furthermore, Plaintiff's argument that in Sebacic Acid from the People's Republic of China, Commerce concluded that a party that is conditionally revoked from

an order is still subject to the order. Plaintiff's Motion at 39 (citing <u>Sebacic Acid From the People's Republic of China: Preliminary Results of Changed Circumstances Review and Intent To Reinstate the Antidumping Duty Order</u>, 69 Fed. Reg. 68,879 (November 26, 2004) ("<u>Sebacic Acid</u>")).  Plaintiff's argument is not without merit, but fails to show that in the event that dumping of an expanded group of merchandise recurs, Commerce is compelled to proceed against the revoked producers by conducting a changed circumstances review and reinstating an old order, as opposed to launching a new investigation. Here, Commerce acted reasonably by initiating a new investigation.  Plaintiff was not procedurally disadvantaged by a new proceeding in lieu of a reinstatement proceeding because Commerce as part of a new investigation is required to make an affirmative injury determination and impose a more liberal <u>de minimis</u> margin standard. <u>See</u> Defendant-Intervenors' Motion at 39.  Furthermore, whereas Commerce in <u>Sebacic Acid</u> experienced a short time between the revocation of the order and resumption of dumping, here, the old order went into effect in 1987, leaving an extended gap between revocations and resumption of dumping activity.  Production, market and monetary conditions changed during that time and NFC, a new product, was added to the market since the old order was put in place.  As a result, reinstatement would not have adequately provided for the changes in market conditions.  In <u>Sebacic Acid</u>, however, Commerce reasonably subjected only one producer to reexamination and reinstated that producer because extensive dumping was occurring through a single exporter that was distorting the market.  Here, almost all producers were revoked from the old order and absent any statutory barriers to launching a new expanded investigation, Commerce reasonably exercised its discretion in initiating an investigation including revoked and excluded producers.

32

**V**
**Conclusion**

For the foregoing reasons, Commerce's final determination in <u>Notice of Final</u>

<u>Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical</u>

<u>Circumstances: Certain Orange Juice from Brazil</u>, 71 Fed. Reg. 2,183 (January 13, 2006) is

affirmed.


        \_\_\_/s/ Evan J. Wallach\_\_\_
        Evan J. Wallach, Judge


Dated: June 19, 2007
     New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                          :
LOUIS DREYFUS CITRUS INC.,                 :
                                          :
          Plaintiff,                       :
                                          :       Before:       WALLACH, Judge
     v.                                    :       Court No.:    06-00122
                                          :
UNITED STATES,                             :
                                          :
          Defendant,                       :
     and                                   :
                                          :
FLORIDA CITRUS MUTUAL et al.,              :
                                          :
          Defendant-Intervenors.           :
_____:


ORDER AND JUDGMENT

This case having come before the court upon the Rule 56.2 Motion for Judgment Upon the Agency Record filed by Louis Dreyfus Citrus Inc. ("Plaintiff's Motion"); the court having reviewed all pleadings and papers on file herein, having heard oral argument by each party, and after due deliberation, having reached a decision herein; now, in conformity with said decision, it is hereby

ORDERED ADJUDGED AND DECREED that Plaintiffs' Motion is DENIED; and it is further

ORDERED ADJUDGED AND DECREED that the decision of the U.S. Department of Commerce ("Commerce") in Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances: Certain Orange Juice from Brazil, 71 Fed. Reg. 2,183 (January 13, 2006) is hereby SUSTAINED; and it is further

ORDERED that all parties shall review the court's Opinion in this matter and notify the court in writing on or before Tuesday, June 26, 2007. whether any information contained in the Opinion is confidential, identify any such information, and request its deletion from the public version of the Opinion to be issued thereafter.  The parties shall suggest alternative language for any portions they wish deleted.  If a party determines that no information needs to be deleted, that party shall so notify the court in writing on or before June 26, 2007.


\_/s/ Evan J. Wallach_____
Evan J. Wallach, Judge

Dated: June 19, 2007
New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.


Tina Potuto Kimble
Clerk of the Court


Date: _____     By: _____
                                                                Deputy Clerk